## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                    Case No. 12-20043

                                    HON. DENISE PAGE HOOD

v.

ARTHUR PAYTON,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S
## MOTION FOR COMPASSIONATE RELEASE [ECF No. 115]

### I.    Introduction

On June 18, 2020, Defendant Arthur Payton filed a Motion for Compassionate Release. [ECF No. 115] On July 24, 2020, the Court denied the Motion for Compassionate Release.  Defendant appealed and, due to a subsequent clarification in the law by the Sixth Circuit Court of Appeals, the Sixth Circuit vacated the Court's July 24, 2020 Order on September 23, 2021.  Defendant filed a supplemental brief dated October 2, 2021 [ECF Nos. 144, 146], the Government filed a supplemental brief on October 6, 2021 [ECF No. 141], and Defendant filed a response to the Government's supplemental response dated October 12, 2021. [ECF Nos. 143, 145] On October 18, 2021, the Sixth Circuit remanded the matter to this Court to allow the Court to address Defendant's compassionate release motion under the proper legal

framework, specifically 18 U.S.C. § 3553(a).  The Court has reviewed and considered all of the parties' filings regarding Defendant's Motion for Compassionate Release, including the two October 2021 filings [ECF Nos. 143, 145] and one November 2021 filing [ECF No. 147], as well as the Government's October 6, 2021 filing.  Defendant also filed an "Emergency Addendum" dated November 17, 2021 [ECF No. 147], a letter with exhibit dated March 17, 2022 [ECF No. 148], and a letter with exhibit dated August 26, 2022. [ECF No. 149]    For the reasons set forth below, the Court denies Defendant's Motion for Compassionate Release.

## II.    Background

In 1994, a jury in the Southern District of California convicted Defendant of six counts of bank robbery based on robberies that took place in 1993. (Presentence Investigation Report in this case (12-20043) ("PSR") at ¶ 62). Defendant only robbed one of the banks himself. *Id*. For the other five bank robberies, Defendant recruited drug-addicted prostitutes and had them rob banks for him. *Id*. Defendant controlled every aspect of the robberies. He told each woman what to say once she got inside the bank; he gave them clothing to wear during the robberies; and he gave them a toy gun to be used to threaten the tellers. *Id*. Defendant promised that he would give the women money from the robbery proceeds. *Id*. Defendant was sentenced to ten years in prison. *Id*.

Defendant was released from prison on January 24, 2002. *Id*. In July 2002, the Southern District of California transferred jurisdiction over Defendant's supervised release to the Eastern District of Michigan. *Id*.  The same month—July 2002—six months after he was released, Defendant began orchestrating more robberies. ECF No. 52-5 (2004 Plea Transcript in Case No. 03-80291), Page ID 194-202. As in most of the 1993 robberies, Defendant did not rob the banks himself – he used drug-addicted prostitutes to rob the banks for him. *Id*. Defendant was arrested in November 2002 (less than ten months after he was released from prison), and he ultimately pleaded guilty to seven counts of aiding and abetting bank robbery. PSR ¶ 63.  He was sentenced to ten years in prison.

Defendant was released from prison on July 29, 2011. PSR ¶ 63. On October 16, 2011, less than three months later, Defendant met Nancy Barta, a drug-addict who recently turned to prostitution to support her addiction, and conned her into robbing banks for him. ECF No. 76 (10/31/12 Trial Tr., 642–706). The next day, Defendant orchestrated the robbery of a Charter One Bank in Farmington Hills, Michigan. *Id*. After that robbery, Defendant orchestrated three more robberies over a two and a half week period. *Id*. at 710–83.  On November 5, 2012, a federal jury convicted Defendant of one count of conspiring to commit bank robbery and four counts of aiding and abetting bank robbery. Judge Lawrence P. Zatkoff originally sentenced

Defendant to 45 years in prison but the sentence was vacated and the case remanded for re-sentencing.  After remand from the Sixth Circuit, the case was reassigned to the undersigned.

At the re-sentencing, the Court carefully considered and addressed all of the § 3553(a) factors—including Defendant's age and risk of recidivism—and concluded that a 20-year sentence was sufficient but not greater than necessary to accomplish the goals of Section 3553(a). ECF No. 99, PgID 1374-90.  When addressing Defendant's age (the primary basis for the remand of the case), the Court stated: "I think this is a . . . kind of crime . . . that [Defendant] could commit easily when he's age, you know, 63, by just going out and getting a car, and . . . charming some woman to go in and rob a bank." *Id*. at 1383. The Court also specifically recognized the inherent danger in Defendant's crimes, *id*. at 1380), and the need for progressive discipline. *Id*. at 1387.

Defendant began serving his prison sentence on February 7, 2013 (with credit for pretrial detention).  He is currently incarcerated at FCI Hazelton, though the Federal Correctional Complex in Hazelton has four separate facilities—a United States Penitentiary (USP), a satellite prison camp, a Federal Correctional Institution (FCI) where Defendant is held, and a secure female facility.  Defendant's projected release date is December 30, 2028 (with credit for good-time served).

Defendant is 54 years old, and he claims underlying medical conditions of

obesity (BMI of 31.7 in April 2018), psoriatic arthritis in his right knee (as medicated), benign hypertension (high blood pressure), and pre-diabetes. ECF No. 116, PgID 1564, 1571-73.  He also claims that he is immuno-compromised and the medical care at FCI-Hazelton is deficient. ECF Nos. 143, 144.  Defendant has moved for compassionate release based on his medical conditions and the Covid-19 pandemic.  It is undisputed that Defendant has exhausted his administrative remedies.

## III.   Analysis

A court may reduce a term of imprisonment if it determines "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A).  A court also must weigh the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine if a sentence reduction "is consistent with applicable policy statements issued by the Sentencing Commission." *Id*.   Although this Court and many others previously believed that U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018) constituted the "applicable policy statement[]" with which courts must comply under 18 U.S.C. § 3582(c)(1)(A), the Sixth Circuit has now established that Section 1B1.13 is not applicable, nor is it to be considered by the Court, when determining whether there are extraordinary and compelling reasons warranting a reduction in sentence. *See, e.g., United States v. Hampton*, No. 20-3649 (6th Cir. Jan. 19, 2021); *see also United States v. Elias*, No. 20-3654 (6th Cir. Jan. 6, 2021); *United States v.*

5

*Jones*, 980 F.3d 1098 (6th Cir. 2020).

"Extraordinary" is defined as "exceptional to a very marked extent." Webster's Third International Dictionary, Unabridged (2020). "Compelling" is defined as "tending to convince or convert by or as if by forcefulness of evidence." *Id.* A court in the Eastern District of Michigan has described the requirements of "'extraordinary' as beyond what is usual, customary, regular, or common," and "'compelling reason' as one so great that irreparable harm or injustice would result if the relief is not granted." *See United States v. Sapp*, Case No. 14-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020) (citations omitted). And, as the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *United States v. Saldana*, 807 F. App'x 816, 820-21 (10th Cir. 2020).

The Court denies Defendant's Motion on the merits. For purposes of the Court's analysis regarding the Section 3553(a) factors, the Court will accept as true Defendant's contention that his health conditions <u>may</u> contitute an "extraordinary and compelling reason" for release.[1]   Even making that assumption, however, the Court

---

[1]The Court notes, as did Defendant and the Government, that Defendant has been fully vaccinated against the Covid-19 virus since April 13, 2021, having received the two doses of the Pfizer Covid-19 vaccine on March 10, 2021 and March 30, 2021. Courts have almost uniformly recognized that defendants (including incarcerated defendants) are "not at high risk of contracting severe COVID-19 because [they] . . . have received both doses of the Pfizer vaccine." *United States v. Groom*, 2021 WL 1220225, at *2 (S.D. Ohio Apr. 1, 2021). And,

denies Defendant's Motion for Compassionate Release after a consideration of all of the Section 3553(a) factors, in particular his criminal history and the nature and characteristics of the instant case.

The Court has reviewed and considered Defendant's contentions that he has been a model inmate, worked hard, taken productive classes, and gotten married while incarcerated. Defendant asserts:

> Mr. Payton has displayed excellent behavior in prison, maintaining a record of "clear conduct." May 18, 2020 Summary Release Plan, attached as Exhibit D, at 2. While in custody, Mr. Payton has completed several adult continuing education courses, and has been employed by the prison's Commissary, receiving a promotion to the grade 1 position—the "top paying position in the commissary . . . held by the hardest working and most knowledgeable worker." A. Payton Work Reference from L. Conner, Assistant Trust Fund Supervisor, dated May 15, 2020, attached as Exhibit E. His supervisor at the commissary acknowledged Mr. Payton's dedication, stating that he "certainly earned this promotion through his hard work and dedication to the

---

"[a]ccording to the clinical trials published on the CDC's website, the Pfizer vaccine was 95% effective at preventing COVID-19 in people who did not have a previous infection. More importantly for purposes of this motion, clinical trials have shown that the Pfizer vaccine is 100% effective at preventing severe disease. Therefore, because Defendant will be at little-to-no-risk of severe COVID-19 shortly after receiving his second Pfizer dose, there are no 'extraordinary and compelling reasons' justifying a compassionate release in this case." *See, e.g., id.* (citing *United States v. Miller*, No. 13-20928, 2021 WL 1115863, at *2 (E.D. Mich. Mar. 24, 2021). The Court recognizes that seven months have passed since Defendant became fully vaccinated, but the risk of severe Covid-19 for such a fully vaccinated person remains very low. As of October 27, 2021, there were 0 inmate and 2 staff cases of Covid-19 infection then-existing (and there was only one such inmate case as of October 6, 2021, when the Government filed its supplemental brief). The Court notes that Defendant's Emergency Addendum dated November 17, 2021, indicates that 3 inmates had recently contracted Covid-19 amidst a breakout at FCI Hazelton. As of November 30, 2021, there were 10 inmate and 1 staff cases of Covid-19 infection then-existing. *See* https://www.bop.gov/coronavirus/ (Nov. 30, 2021).

Commissary." *Id*. ("He works with 100% effort daily, and always has a smile on his face while doing it. The skills he has learned while holding this position are how to stock, rotate, store, and order inventory for a multi-million dollar business. . . . He is a valuable worker at the FCI Hazelton Commissary, and I believe he would be a valuable worker to any business that would hire him.").

If released, Mr. Payton will have a strong support system in place. Mr. Payton will reside at home with his wife in Fairmont, West Virginia; she is employed and has health insurance coverage, which she has confirmed can cover Mr. Payton. At home with Mrs. Payton, Mr. Payton would be able to follow Centers for Disease Control ("CDC") Guidelines for self-quarantine. After self-quarantine, Mr. Payton would seek employment in an area where he is already trained and has experience (for example cook, food service, or warehouse inventory). *See* Exs. D, E.

ECF No. 116, PgID 1564-65. Defendant also argues:

Mr. Payton has been incarcerated since 2013 and will be parole eligible in December 2028. May 15, 2020 Inmate Identification and Address Verification Letter from N. Lotspeich, attached as Exhibit F. He has served about 101 months of his 240 month sentence, which translates to approximately 42% of his imposed sentence. *See* Ex. D. Notably, given his projected release date of December 30, 2028, as a practical matter, Mr. Payton already has served 50% of the sentence he is presently expected to serve. *See id.*

While in custody at FCI Hazelton, Mr. Payton has completed various educational courses. *See id; see also* Inmate Education Data, attached as Exhibit G. He has worked steadily in the Commissary since January 2019, earning very high evaluations from his supervisor. *See* Ex. E. Mr. Payton has received no disciplinary citations during his time at FCI and has used his time as an inmate to rehabilitate himself and become a productive community member. *See* Exs. D–G. He has also married a law-abiding and stable partner. In light of these efforts to rehabilitate himself, as well as his advancing age and loving, healthy marriage, Mr. Payton is not the man he was years ago and is not a threat

to the public.

*Id*. at PgID 1580-81.  In his reply, Defendant claims:

> The Government also ignores the progress Mr. Payton has made over the 102 months he has served. The § 3553(a) sentencing factors warrant reducing Mr. Payton's sentence to time served. Rather than address Mr. Payton's efforts and advances (Br. 5–6, 21–22), the Government simply rehashes Mr. Payton's sentencing hearing. See Opp'n 20–24. The Government has not shown that Mr. Payton is a now danger to the public or that a reduction to time served is not a sufficient punishment, given the risks to Mr. Payton's health, including risk of death. See Ex. A; Br. 5–6, 12–20.
>
> * * * * *
>
> Upon release, Mr. Payton plans to live with his wife of four years, Twyla Payton, who is a consistently positive and supportive influence on his life. Mrs. Payton has steady employment, a two-bedroom home, and can provide health insurance for Mr. Payton. Br. 6, 20. Upon release, Mrs. Payton will pick him up and drive him home to Fairmont, West Virginia where they will remain in her home for at least two weeks. Mrs. Payton is able to work remotely out of her home and quarantine safely along with Mr. Payton. Finally, while Mr. Payton is eager to start working, he will not do so until permitted by this Court and only after the number of cases in his surrounding community have subsided such that he is no longer at risk.

ECF No. 124, PgID 1886-87.

Although the Court understands Defendant's arguments and commends his behavior and apparent progress while in custody at FCI Hazelton during his current sentence, the Court cannot ignore Defendant's criminal history or the nature and circumstances of the underlying offenses.  Defendant has been involved in and coordinated robbing banks, indisputably crimes of violence, during any period that he has not been incarcerated over (at least) the last 28 years.

Defendant has three federal convictions for doing the exact same thing—recruiting and using drug-addicted prostitutes to rob banks.   In 1994, Defendant was convicted of six bank robberies conducted in 1993 in the Southern District of California (of which he personally robbed one bank but recruited drug-addicted prostitutes to rob the other five banks).   After being sentenced to 10 years in prison for those convictions, Defendant was released from prison on January 24, 2002. Less than six months later (while on supervised release), he coordinated the robbery of seven more banks in the Eastern District of Michigan.   Defendant did not personally or physically rob the banks; instead, he used drug-addicted prostitutes to enter the banks and demand the money.   In that case, also assigned to the undersigned, Defendant was sentenced to 10 more years in prison.   When Defendant was released from prison, he started a term of supervised release.   Less than three months later, Defendant recruited Nancy Barta to rob four more banks. At the time of his arrest, Defendant was actively planning additional robberies of Detroit area banks by using drug-addicted prostitutes.

As the Government states, Defendant's description of his progress while incarcerated on the present case and his suggestion that his criminal activity will be a thing of the past is not a new story from Defendant.   When being sentenced 2005, Defendant told the Court that, during his first term of incarceration, he did not have a single incident report in prison, he took every educational program available, he

never missed a probation appointment upon his release, he started counseling, and he had secured gainful employment. Case No. 03-80291, ECF No. 89, PgID 529-32. He admitted that he was ruining the lives of the women he conned, and he claimed that he was a changed man. *Id.* But, the fact is that as soon as he was released from prison in 2005, Defendant resumed recruiting drug-addicted prostitutes to rob banks for him.

Defendant made similar statements about turning his life around when re-sentenced by the undersigned in 2015. He represented that, during his incarceration on the convictions for his 2002 robberies, he took many classes, including a 6,000-hour cooking apprenticeship program and a 2,000-hour business program. ECF No. 99, PgID 1366-73. But, despite obtaining a job as a chef when he got out of prison in 2012, he began recruiting more women to rob banks for him within three months of his release. *Id.* at 1377-78; PSR ¶ 88.

Defendant also claimed at that 2015 re-sentencing that he had come to understand that the women he recruited were victims, that he learned his lesson, and that he would not be appealing his new sentence. *Id.* at 1369-70, 1389-90. Shortly thereafter, however, Defendant filed a § 2255 petition in which he claimed that the women "lied over and over" to protect themselves, which suggests that he was distancing himself for any guilt with respec to the dangerous crimes he masterminded. ECF No. 90, PgID 1265-68.

At Defendant's re-sentencing in 2015, the Court considered all of Defendant's

claims and addressed the § 3553(a) factors in detail, including Payton's age and risk of recidivism, his claimed efforts to better himself, his employment and his conduct in prison.  The Court concluded that a 20-year sentence was sufficient, but not greater than necessary, to accomplish the goals of sentencing. ECF No. 99, PgID 1374-90. The Court specifically recognized the danger of the crimes for which Defendant has been convicted  – and manner in which he committed the crimes, *id*. at 1380, and the need for progressive discipline.  *Id*. at 1387.  The Court noted that Defendant's two previous 10-year sentences had not proven to be an adequate punishment or deterrence to Defendant's propensity for robbing banks and using vulnerable persons to do so. *Id*. at 1379.

Defendant is now 54 years old.  Defendant has served approximately 50% of his 20-year sentence.  So far, he has served about the same amount of time on this conviction as his sentence on each of his first two sentences, neither of which deterred him from resuming bank robberies and using drug-addicted prostitutes to do so, even when he had a legitimate job.  Bank robberies are, by statute and under the sentencing guidelines, crimes of violence and present a danger to the community.  The bank robberies coordinated by Defendant are dangerous not only for the employees and patrons of the banks that are robbed but also the desperate persons that Defendant recruits to commit them.  Defendant's conduct upon release from the first two sentences for bank robbery convictions demonstrate that the Court cannot simply

accept his representations that he is a new man and that he will not resume criminal activity upon release. Those representations have been made before, yet within months of his release from prison for each of those sentences, Defendant recruited desperate persons to rob banks for him.

Defendant also claims that, due to his age and the decreasing rates of recidivism for persons as they age, he is not likely to re-engage in criminal conduct. But, as the Court noted at Defendant's 2015 re-sentencing in this case, age is no barrier to the manner of crime in which Defendant has engaged repeatedly: "I think this is a . . . kind of crime . . . that [Payton] could commit easily when he's age, you know, 63, by just going out and getting a car, and . . . charming some woman to go in and rob a bank." ECF No. 99, PgID 1383).

For the reasons set forth above, the Court concludes that the circumstances and nature of the current offense, as well as Defendant's history and characteristics, show that age is not an impediment to continued criminal activity. Past sentences have not deterred Defendant from continuing to coordinate and participate in bank robberies. The Court therefore concludes that, after a consideration of all of the factors set forth in 18 U.S.C. § 3553(a), the early release of Defendant is not warranted. As the Court cannot discount the risk of danger to the community posed by Defendant, it will not grant Defendant a compassionate release due to the COVID-19 pandemic. Defendant's Motion for Compassionate Release is denied.

13

**IV.   Conclusion**

Accordingly,

IT IS ORDERED that Defendant's Motion for Compassionate Release [ECF

No. 115] is DENIED.

IT IS ORDERED.

<u>s/Denise Page Hood</u>
DENISE PAGE HOOD
Dated: May 22, 2023          UNITED STATES DISTRICT JUDGE